METROPOLITAN UTILITIES DISTRICT OF OMAHA, A NEBRASKA POLITICAL SUBDIVISION AND MUNICIPAL CORPORATION, APPELLANT AND CROSS-APPELLEE, V. AQUILA, INC., APPELLEE, A DELAWARE CORPORATION, AND THE NEBRASKA PUBLIC SERVICE COMMISSION, APPELLEE AND CROSS-APPELLANT.

712 N.W.2d 280

Filed April 21, 2006.   No. S-05-127.

Paul M. Schudel and Krista L. Kester, of Woods & Aitken, L.L.P., and Susan E. Prazan for appellant.

Jon Bruning, Attorney General, and L. Jay Bartel for appellee Nebraska Public Service Commission.

L. Steven Grasz, Megan Sebastian Wright, and Michael J. Mullen, of Blackwell, Sanders, Peper & Martin, L.L.P., for appellee Aquila, Inc.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

CONNOLLY, J.

Metropolitan Utilities District of Omaha (MUD) appeals the district court's order affirming a decision of the Nebraska Public Service Commission (PSC). The PSC ordered MUD to cease and desist construction of a gas main extension. Aquila, Inc., MUD's competitor, filed a formal complaint with the PSC for a determination that MUD's proposed extension was not in the public interest as required by Neb. Rev. Stat. § 57-1303 (Reissue 2004). The PSC found that MUD's extension was not in the public interest and ordered MUD to cease and desist construction. Applying the factors set out in § 57-1303, the court found that the proposed extension was not in the public interest and affirmed the PSC's order. On appeal, MUD contends that the PSC lacked jurisdiction over the matter or, in the alternative, that the extension is in the public interest. Because the record reflects competent evidence to support the district court's finding, we affirm.

## I. BACKGROUND

### 1. TERMS AND GENERAL BACKGROUND

MUD is a political subdivision operating as a natural gas and water utility in the city of Omaha and in Sarpy County, Nebraska. Aquila, an investor-owned natural gas utility, operates in areas of Sarpy County. Aquila and MUD are distributors of natural gas and have contracts with Northern Natural Gas (Northern), which supplies natural gas to distributors in the area.

Northern transfers the natural gas to each of its distributors at a servicing town border station (TBS). Each TBS serves only one distributor and is designed to supply a specific amount of natural gas. TBS's operate independently of each other and are designed and used by MUD, but are owned by Northern.

According to MUD, urban encroachment around a TBS can create safety issues. MUD prefers to have its TBS's equally spaced around the perimeter of its service area and in undeveloped areas. When it builds a TBS, it considers the current customer load and the potential for new customers. According to MUD, it oversizes its TBS's so that the zones of influence of each TBS overlap if there is a loss of service from any particular TBS.

## 2. Disputed Issue

At issue is a new TBS built at 174th Street and Fairview Road in Sarpy County (Fairview TBS) for extension of three separate gas mains to connect MUD's southwest service area to the Fairview TBS. MUD has added 8,000 customers in the area in the past 3 years and expects to add about 3,000 more each year.

In 2002, MUD's board of directors authorized the extension of its gas mains along U.S. Highway 50 from 1,500 feet south of U.S. Highway 370 to Fairview Road and along Fairview Road from Highway 50 to 174th Street. It also authorized the construction of the Fairview TBS. MUD decided on the site for the Fairview TBS because it is located 5½ miles south of MUD's existing service border. MUD previously considered six other areas, but they were rejected for varying reasons, such as objections by Aquila, proximity to a school, proximity to a planned business park, and future grade changes to the road.

MUD and Northern then entered into a contribution agreement which provided, among other things: (1) a contribution by Northern of $4.35 million in aid of construction to MUD payable in September 2002, with Northern retaining ownership of the branch line; (2) realignment of an amount of natural gas flow from a TBS located at 84th and Center Streets (Center Street TBS) to other mutually agreed-upon MUD delivery points to give Northern the ability to lower the branch line pressure; and (3) reimbursement to Northern for the cost of the Fairview TBS up to $500,000 by MUD. Because of the contribution agreement, the amount of natural gas per day at the Center Street TBS was reduced and a portion moved to a TBS located at 175th and Center Streets.

In May 2003, Aquila filed a formal complaint with the PSC seeking an order that MUD's proposed gasline extension under the contribution agreement violated Neb. Rev. Stat. §§ 57-1301 to 57-1307 (Reissue 2004) because it was not in the public interest. The PSC ultimately determined that the extension was not in the public interest and entered an order to cease and desist additional construction. MUD appealed to the district court and made the PSC a party to the appeal. The PSC unsuccessfully sought to be dismissed from the action.

The district court affirmed. The court first rejected an argument that it lacked jurisdiction. The court next applied the public interest factors under § 57-1303 and concluded that MUD failed to show that the extension was in the public interest. MUD appeals, and the PSC cross-appeals.

## II. ASSIGNMENTS OF ERROR

MUD assigns, rephrased and consolidated, that the district court erred by (1) determining that it had jurisdiction and (2) affirming the cease and desist order. On cross-appeal, the PSC assigns that the district court erred by not dismissing it from the action.

## III. STANDARD OF REVIEW

The question of jurisdiction is a question of law, upon which an appellate court reaches a conclusion independent of the trial court. *Gabel v. Polk Cty. Bd. of Comrs.*, 269 Neb. 714, 695 N.W.2d 433 (2005). In addition, the meaning of a statute is a question of law. *In re Petition of SID No. 1*, 270 Neb. 856, 708 N.W.2d 809 (2006).

A final order entered by a district court in a judicial review under the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Gracey v. Zwonechek*, 263 Neb. 796, 643 N.W.2d 381 (2002).

In an appeal under the Administrative Procedure Act, an appellate court will not substitute its factual findings for those of the district court where competent evidence supports the district court's findings. *Tyson Fresh Meats v. State*, 270 Neb. 535, 704 N.W.2d 788 (2005).

## IV. ANALYSIS

### 1. JURISDICTION

MUD first argues that the PSC lacked jurisdiction over the dispute because the extension's purpose was operationally driven to maintain and enhance MUD's subsystem reliability and capacity and was not for the extension of service to new customers. According to MUD, § 57-1303 applies only to extensions of services to new customers. We disagree.

Section 57-1303 provides in part:

> No investor-owned natural gas utility or metropolitan utilities district may extend or enlarge its natural gas service area or extend or enlarge its natural gas mains or natural gas services unless it is in the public interest to do so.

Under § 57-1306, the PSC is given power to determine whether an extension or enlargement is in the public interest:

> If the investor-owned natural gas utility or the metropolitan utilities district disagrees with a determination by an investor-owned natural gas utility or a metropolitan utilities district that a proposed extension or enlargement is in the public interest, the matter may be submitted to the Public Service Commission for hearing and determination in the county where the extension or enlargement is proposed . . . . In making a determination whether a proposed extension or enlargement is in the public interest, the commission shall consider the factors set forth in sections 57-1303 and 57-1304. The commission shall have no jurisdiction over a metropolitan utilities district or natural gas utility beyond the determination of disputes brought before it under sections 57-1301 to 57-1307.

Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *McCray v. Nebraska State Patrol, ante* p. 1, 710 N.W.2d 300 (2006). Further, we strictly construe jurisdictional statutes. See *Nebraska Dept. of Health & Human Servs. v. Struss*, 261 Neb. 435, 623 N.W.2d 308 (2001).

The plain language of § 57-1303 states that it applies to extensions or enlargements of a natural gas service area or extensions or enlargements of natural gas mains or natural gas

services. Section 57-1306 specifically gives the PSC jurisdiction to determine whether extensions or enlargements are in the public interest. The statute does not limit the determination to only extensions of service to new customers. Instead, it specifically includes enlargement of natural gas mains or services without reference to new customers. Under the plain language of §§ 57-1303 and 57-1306, the PSC had jurisdiction.

## 2. PUBLIC INTEREST DETERMINATIONS

MUD contends that its extension is in the public interest.

Section 57-1303 provides five factors to be considered when determining whether an extension or enlargement is in the public interest. Under § 57-1303:

> In determining whether or not an extension or enlargement is in the public interest, the district or the utility shall consider the following:
>
> (1) The economic feasibility of the extension or enlargement;
>
> (2) The impact the enlargement will have on the existing and future natural gas ratepayers of the metropolitan utilities district or the investor-owned natural gas utility;
>
> (3) Whether the extension or enlargement contributes to the orderly development of natural gas utility infrastructure;
>
> (4) Whether the extension or enlargement will result in duplicative or redundant natural gas utility infrastructure; and
>
> (5) Whether the extension or enlargement is applied in a nondiscriminatory manner.

In addition, Neb. Rev. Stat. § 14-2117 (Reissue 1997) provides in part:

> No metropolitan utilities district may extend or enlarge its service area unless it is economically feasible to do so. In determining whether or not to extend or enlarge its service area, the district shall take into account the cost of such extension or enlargement to its existing ratepayers.

We note that no one single factor may be dispositive to any particular case. Cases may vary, and whether an extension is in the public interest depends on the facts and circumstances of each case.

The district court found that the extension was not in the public interest because MUD (1) failed to prove it was economically feasible, (2) failed to consider the impact on ratepayers, and (3) did not take orderly development into consideration. The court found that the extension was not redundant and that there was no evidence of discriminatory purpose or effect.

### (a) Economic Feasibility

MUD argues that it has shown the economic feasibility of the extensions. According to MUD, the project was subjected to its budget review and was determined to be economically feasible. It also argues that any further analysis was not required because the extensions are for increasing system performance and safety instead of growth.

According to MUD, it has shown economic feasibility for the following reasons: (1) It considered expanding the capacity of existing TBS's, but believed that would not be feasible because of area growth and because the reduction in pressure at the Center Street TBS required a new TBS to meet demand; (2) the Fairview TBS location presented the best way to shore up and maintain the system's reliability in that section of the service area; and (3) the extension required only slight grade changes in the road, the area was not well populated, and the site location was near a landfill, which site would likely not face future urban encroachment.

Although the extensions were included in MUD's budget process for determining feasibility of the budgeted items, MUD stated in its answers to interrogatories that because Northern provided money to MUD that it used for the project, "no further economic feasibility analysis was needed." At a hearing before the PSC, a MUD employee admitted that an independent economic feasibility study was not completed, but that a "ballpark number" or analysis was performed. Also, MUD's argument that it failed to do an economic feasibility study because the extension was for enhanced system reliability is undermined by the testimony of MUD's senior gas designer. He testified that the Fairview TBS was sized for future growth. In addition, the record reflects that Northern plans to apply to the Federal Energy Regulatory Commission (FERC) to seek recovery of $4.35 million from its

ratepayers. The court found that "if Northern is successful in its application, ratepayers of MUD and Aquila will be required to pay a portion of the payment through their rates."

The district court found that MUD did not complete a before-the-fact economic feasibility analysis of the extension. The court noted that although the extensions were intended in part to make up for loss of capacity at the Center Street TBS, the extension's primary purpose was for growth. The court discounted MUD's argument that it considered economic feasibility as part of the budget process. The court stated: "Section 57-1303(1) requires a specific economic feasibility analysis of a proposed extension or enlargement, not a generic representation that, through the general course of doing business, economic feasibility is considered for each project for which there is capital expenditure authorization through normal budgetary process."

The court noted that it was possible for costs to get passed to ratepayers if Northern were successful in its application to the FERC to recover the $4.35 million paid under the contribution agreement and if the cost reimbursed to Northern for the Fairview TBS were passed to ratepayers. The court also concluded that before MUD extended or enlarged its service area, it had to comply with § 14-2117, which requires a determination of economic feasibility, taking into account the effect of the extension or enlargement on ratepayers.

We determine that the district court's findings are supported by competent evidence. The record shows that an economic feasibility study was not completed before the extension was started. The record contains evidence that when the extension was considered in the budget process, MUD failed to consider that it would have to reimburse Northern up to $500,000 for the Fairview TBS. Further, although MUD contends that the extension was for an upgrade to system reliability and safety, the record contains competent evidence to support the district court's conclusions that the primary purpose for the extension was for growth. Yet, MUD did not consider the system's growth as a factor when considering economic feasibility of the extension. Thus, there was competent evidence to support the conclusion of the district court that MUD failed to determine economic feasibility before it began the extension and, thus, violated § 14-2117.

Accordingly, we determine that the district court's finding that MUD failed to show that the extension was economically feasible was supported by competent evidence.

(b) Impact on Ratepayers

MUD argues that the district court wrongly determined that it failed to consider the impact on ratepayers. MUD argues that any rate increase would be offset by increased reliability and improvement to its system and that the extension would resolve the safety and capacity issues at the Center Street TBS. According to MUD, it would cost more to make changes at the Center Street TBS to fix the safety and capacity concerns.

Because the Fairview TBS was designed to accommodate projected use 5 years into the future, the court found that the primary purpose of the Fairview TBS was to accommodate future growth that could affect ratepayers. In addition, the court found that although the Fairview TBS was developed to meet future capacity, the evidence failed to show when it would require full capacity. The court found that if Northern were successful in its application to the FERC to recover the $4.35 million paid to MUD under the contribution agreement, a percentage of those costs would be passed to MUD and Aquila ratepayers. Likewise, it found that ratepayers would be responsible for the cost of MUD's reimbursement to Northern.

As previously stated, MUD failed to consider the potential effect on ratepayers. The record reflects that the Fairview TBS was constructed with growth in mind and is designed to be oversized for at least 5 years. Although MUD states that it needs to consider future customers and oversizes TBS's to cover for loss of service, MUD was still required to consider the effect of such items on ratepayers. In addition, such determinations were required before MUD undertook construction. Despite MUD's arguments that it determined there was no effect on ratepayers, the record supports the court's determinations that the extension's purpose was to accommodate MUD's growth and that how the growth impacted its ratepayers was not properly considered. Accordingly, we find there was competent evidence to support the court's factual findings concerning the impact on ratepayers.

### (c) Orderly Development of Infrastructure

MUD contends that the court erred when it determined that the extension did not contribute to the orderly development of the natural gas infrastructure. MUD argues it considered evidence of safety concerns and that it considered and rejected a number of alternate TBS sites.

The court found that although the Fairview TBS would provide some relief at the Center Street TBS and MUD provided reasons for its location, the location was established for the primary purpose of establishing a foothold in an area fertile for future customers. The court stated that although such a decision might be good business acumen, it did not consider whether the extension promoted orderly development of the infrastructure.

As in the sections regarding feasibility and impact, the record contains evidence that MUD chose to place the Fairview TBS near the edge of its existing borders and in a location that would place it in an area of high future growth. The record also supports the conclusion that although relief for the Center Street TBS was a factor, the goal of growth was a primary factor. The district court's findings that MUD failed to show that the extension contributed to orderly development were supported by competent evidence. Because we find that the court's factual findings in all respects were supported by competent evidence, we affirm.

### 3. Cross-Appeal

The PSC contends that it was not a required party to the appeal under Neb. Rev. Stat. § 84-917 (Reissue 1999) because its main role in the action was to act as a neutral factfinding body.

Since August 2003, appeals of PSC orders are in accordance with the Administrative Procedure Act. Neb. Rev. Stat. § 75-136 (Reissue 2003). Section 84-917(2)(a) provides in part:

> Proceedings for review shall be instituted by filing a petition in the district court of the county where the action is taken within thirty days after the service of the final decision by the agency. All parties of record shall be made parties to the proceedings for review. If an agency's only role in a contested case is to act as a neutral factfinding body, the agency shall not be a party of record. In all other cases, the agency shall be a party of record.

An administrative agency is a neutral factfinding body when it is neither an adversary nor an advocate of a party. *In re Application of Metropolitan Util. Dist.*, 270 Neb. 494, 704 N.W.2d 237 (2005). See *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984). However, when an administrative agency acts as the primary civil enforcement agency, it is more than a neutral fact finder and is a required party. *In re Application of Metropolitan Util. Dist., supra.* See *Becker v. Nebraska Acct. & Disclosure Comm.*, 249 Neb. 28, 541 N.W.2d 36 (1995).

We recently noted that the overall power of the PSC concerning natural gas utilities gave the PSC the authority to set conditions on certifications, resolve disputes, investigate complaints, and issue and enforce orders. *In re Application of Metropolitan Util. Dist., supra*, citing Neb. Rev. Stat. § 66-1804(1) (Reissue 2003). In that case, MUD submitted an application seeking certification as a competitive natural gas provider. We determined that under the authority given to the PSC, the PSC was not acting as a neutral factfinding body and was a proper party to the action.

Here, the PSC jurisdiction extends to §§ 57-1301 to 57-1307. Section 57-1306, however, limits the role of the PSC, providing in part as follows:

> If the investor-owned natural gas utility or the metropolitan utilities district disagrees with a determination by an investor-owned natural gas utility or a metropolitan utilities district that a proposed extension or enlargement is in the public interest, the matter may be submitted to the Public Service Commission for hearing and determination in the county where the extension or enlargement is proposed and shall be subject to the applicable procedures provided in sections 75-112, 75-129, and 75-134 to 75-136. In making a determination whether a proposed extension or enlargement is in the public interest, the commission shall consider the factors set forth in sections 57-1303 and 57-1304. *The commission shall have no jurisdiction over a metropolitan utilities district or natural gas utility beyond the determination of disputes brought before it under sections 57-1301 to 57-1307.*

(Emphasis supplied.)

Here, the PSC was not acting as a certifying agency or the primary civil enforcement agency. Nor was the PSC acting in the role of an adversarial party or enforcing a previous order. Instead, the PSC was acting as a factfinding body to determine the validity of Aquila's complaint seeking a cease and desist order. In this circumstance, we determine that the PSC was not a necessary party to the action. Therefore, the district court should have dismissed the PSC from the appeal.

## V. CONCLUSION

We determine that the PSC and the district court had jurisdiction over the action. We further determine that the record contains competent evidence to support the district court's factual determination that the extension was not in the public interest. On cross-appeal, we agree that the PSC was not a necessary party to the appeal. Accordingly, we affirm the cease and desist order, but direct that the PSC be dismissed from the action.

AFFIRMED WITH DIRECTION.

WRIGHT, J., not participating.